NO. _____

IN THE COURT OF CRIMINAL

APPEALS OF TEXAS

AUSTIN, TEXAS

_____

JUAN RODRIGUEZ-OLIVAS,
Appellant

VS.

THE STATE OF TEXAS,
Appellee

_____

On Petition for Discretionary Review from Cause no. 02-13-00520-
CR in the Second Court of Appeals, Fort Worth, Texas

_____

**APPELLANT'S PETITION FOR DISCRETIONARY REVIEW**
_____

Respectfully Submitted,

Anthony D. Lyons
State Bar No. 12741750
320 S. R.L. Thornton Frwy,
Ste. 300
Dallas, Texas 75203
214-941-1881
214-941-1399 (fax)

John D. Nation
State Bar No. 14819700
4925 Greenville,
Ste. 200
Dallas, Texas 75206
214-800-5160
214-800-5161 (fax)

Attorneys for Appellant

RECEIVED IN
COURT OF CRIMINAL APPEALS

November 17, 2015

ABEL ACOSTA, CLERK

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................. 3

STATEMENT REGARDING ORAL ARGUMENT ............................. 5

STATEMENT OF THE CASE............................................................. 5

STATEMENT OF PROCEDURAL HISTORY ..................................... 5

FACT STATEMENT .......................................................................... 5

APPELLANT'S GROUND FOR REVIEW NO. ONE............................ 8

APPELLANT'S GROUND FOR REVIEW NO. TWO ......................... 11

APPELLANT'S GROUND FOR REVIEW NO. THREE ......................14

APPELLANT'S GROUND FOR REVIEW NO. FOUR........................15

APPELLANT'S GROUND FOR REVIEW NO. FIVE .........................18

CONCLUSION AND PRAYER FOR RELIEF ................................... 23

CERTIFICATE OF COMPLIANCE ................................................... 24

CERTIFICATE OF SERVICE............................................................ 24

# TABLE OF AUTHORITIES

**Cases**

*Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007..........12

*Anderson v. Bessemer City*, 470 U.S. 564, 574-575 (1985)...............12

*Anderson v. State*, 787 S.W.2d 221, 229 (Tex. App.—Fort Worth 1990, no pet.).....................................................................................15

*Brick v. State,* 738 S.W.2d 676, 681 (Tex. Crim. App. 1987)..............17

*Florida v. Royer*, 460 U.S. 491, 500 (1983) ......................................15

*Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App.1987), *cert. denied*, 484 U.S. 905 (1987). .......................................................... 24

*Good v. State*, 723 S.W.2d 734, 738 (Tex. Crim. App. 1986)............. 24

*Hill v. State*, 303 S.W.3d 863, 872 (Tex. App.—Fort Worth 2009, pet. ref'd)......................................................................................13

*McCartney v. State*, 542 S.W.2d 156, 160 (Tex. Crim. App. 1976)... 22, 23

*Meekins v. State*, 340 S.W.3d 454, 458-459 (Tex. Crim. App. 2011). 18

*Montanez v. State*, 195 S.W.3d 101 (Tex. Crim. App. 2006), .............12

*Munera v. State,* 965 S.W.2d 523, 532 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd) ................................................................17

*Ohio v. Robinette*, 519 U.S. 33 (1996) (Ginsberg, J., concurring). .....15

*Perez v. State*, 818 S.W.2d 512, 517 (Tex. App.—Houston [1st Dist.] 1991, no pet.)..............................................................................15

*Reasor v. State*, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000). ...........18

*Rodriguez-Olivas v. State*, No. 02-13-00520-CR (Tex. App.—Fort Worth 2015)........................................................................passim

*Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973);........................18

*United States v. Watson*, 423 U.S. 411, 424 (1976). ...........................18

*Zimmerman v. State*, (85 Tex. Cr. R 630), 215 S.W. 101 (Cr. App. 1919) ...................................................................................... 22, 23

## Statutes

TEX. PENAL CODE § 19.02 (b) (1)..................................................... 7

## Rules

Tex. R. App. Pro. 66.3 (c): ........................................................passim

## STATEMENT REGARDING ORAL ARGUMENT

Appellant does not request oral argument.

## STATEMENT OF THE CASE

Appellant was indicted for the offense of murder, TEX. PENAL CODE § 19.02 (b) (1). Specifically, he was charged with killing Linda Barrett, his girlfriend. (R. III 18-19). To this indictment Appellant pleaded not guilty and he proceeded to jury trial on both guilt-innocence and punishment. The jury found him guilty as charged and assessed punishment at life imprisonment, having found against Appellant on the sudden passion issue. (R. VI 54).

## STATEMENT OF PROCEDURAL HISTORY

The court of appeals issued the opinion on October 15, 2015. No motion for rehearing was filed.

## FACT STATEMENT

Although the decedent, Linda Barrett, had been dead for some time, her body was not discovered until June 15, 2012. Shaun Kaufman, an acquaintance of Appellant, was out driving with his girlfriend, attempting to discover what was wrong with his car. (R.III 25). At that time, he saw Appellant, whom he knew as "Juan" or "Mickey." Appellant needed a battery charge to restart his stranded

vehicle. (R.III 28). Kaufman and Appellant drove to Appellant's trailer home to get jumper cables. (R.III 29).

When they arrived at his residence, Kaufman followed Appellant into the master bedroom and watched while Appellant unlocked a closet. Inside, Kaufman saw a dead woman's body, wrapped in plastic and seated on a chair. (R.III 29-31). Though he could not see the face, Kaufman asserted that he knew the woman to be Linda Barrett or Burns, Appellant's girlfriend. Kaufman said nothing, but shook his head. Appellant told him that "she [Linda] was going to get him caught up." (R.III 31-32).

Kaufman went to his mother's house, took an un-prescribed Xanax pill and called the police. After the call went out, Gainesville Police Department Investigator Jack Jones, who knew both Appellant and Linda Burns, set up surveillance on Truelove Street. Appellant's vehicle drove by, stopping to let off a male passenger. When Appellant drove by again, Jones noted the vehicle to Sgt. Jonathan Frith, who drove off in pursuit. (R.IV 57).

Frith followed the vehicle and observed the driver making two turns without signaling. Based on this evidence, Frith stopped the vehicle and approached from the driver's side. This he did with his gun

drawn. (R.IV 18-19). Shortly thereafter, he lowered his weapon and secured it once Appellant and his passenger, Linda Kuykendall, left the car. (R.IV 22). Investigator Jack Jones arrived at the scene and participated in the detention.

Frith "frisked" the vehicle for weapons. (R.IV 41-42). Jones performed a more thorough search of the passenger compartment, finding a credit card in Linda Barrett's name in the rear seat and a BB pistol in the rear floorboard. (R.IV 63).

Sgt. Frith conceded that Appellant essentially was under arrest when he exited the vehicle. (R.IV 40). Jones disagreed, asserting that Appellant was not under arrest or in custody, but in any event was not free to leave. (R.IV 64-65). Jones stated that the search of the passenger compartment was by consent; Frith did not know whether consent was obtained or not. (R.IV 40; 62-63).

Jones contended that he had obtained Appellant's consent to search his residence. The record reflects that Jones asked Appellant if they could go to his residence and "look for Linda." Appellant replied, "Sure, I guess." (R.IV 66).

Sgt. Daniel Orr interviewed Shaun Kaufman at the station. Orr told Investigator Jones that if he smelled decay at the residence, he was

to stop and call in. Orr further advised him that if he encountered a locked closet to stop and inform him. (R.IV 164-167).

These sensible precautions were not followed. Investigator Jones, Appellant and Frith arrived at the residence. Jones informed Frith he had consent to enter and search the residence. (R.IV 67). Appellant unlocked the door and a pit bull came out. The scent of animal urine and feces was overpowering.

Jones observed a locked closet in the northeast corner of the master bedroom. The officer told Appellant he wanted to look inside. Appellant took out his keys and opened the closet. Jones only at this time noticed the odor of a decomposing body and saw a woman, wrapped in plastic, slumping over in a chair. (R.IV 69-70). Only then was Appellant handcuffed and formally placed under arrest. (R.IV 70).

APPELLANT'S GROUND FOR REVIEW NO. ONE

1. **Did the court of appeals err in finding facts based on the videotape of Appellant's detention, rather than determining whether the videotaped evidence supported the trial court's determination of historical facts?**

Reasons for Review:

Tex. R. App. Pro. 66.3 (c): decided important question of law contrary to Court of Criminal Appeals and Supreme Court decisions.

Arguments and Authorities:

At several points in its opinion, the court reviews the video evidence and makes what can only be considered fact findings.[1] These statements are not couched in terms of reviewing the trial court's fact findings and in its findings the court betrays its sympathy for the trial court's denial of Appellant's motion to suppress.

A court of appeals may properly review a videotape to determine if the trial court's fact-findings are appropriate, as long as this review is deferentially done. *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007). Deferential review, however, excludes fact finding by the court, either for or against the trial court's suppression ruling. In *Montanez v. State*, 195 S.W.3d 101 (Tex. Crim. App. 2006), cited but

---

[1] *Rodriguez-Olivas v. State*, No. 02-13-00520-CR (Tex. App.—Fort Worth 2015) *slip op.* at 6 ("It is evident from the video that Jones and Rodriguez-Olivas were familiar with each other."); *slip op.* at 7 (discussion of Appellant possibly selling prescription drugs, an issue not advanced either at trial or on appeal); *slip op.* at 7 (officer refocusing attention on identity of female passenger); *slip op.* at 8 ("From the video, it is apparent that Jones and other officers are receiving information regarding Kaufman's interview while they are detaining Rodriguez-Olivas and Kuykendall.").

not studied by the court, the court of criminal appeals quoted this passage from *Anderson v. Bessemer City*:

> The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much.

195 S.W.3d at 109, *quoting Anderson v. Bessemer City*, 470 U.S. 564, 574-575 (1985).

One might add that fighting the trial court's findings on appeal is expected of appellants; they cannot, however, anticipate fact findings by an appellate court to which they have no opportunity to respond.

**2.  Did the court of appeals err in holding that the facts known to police justified a continued detention beyond the normal scope of an investigative detention?**

**2.1  Did the court of appeals err in holding that the investigative detention was not the fruit of an unlawfully prolonged detention?**

Reasons for Review:

Tex. R. App. Pro. 66.3 (c): decided important question of law contrary to Court of Criminal Appeals and Supreme Court decisions.

Arguments and Authorities:

The court of appeals overruled Appellant's first three points of error challenging the detention of his vehicle and almost immediate arrest, holding that the facts developed by the officers in the allegedly brief investigative detention justified a continued detention beyond that necessary to effectuate the traffic stop. *Slip op.* at 32, citing *Hill v. State*, 303 S.W.3d 863, 872 (Tex. App.—Fort Worth 2009, pet. ref'd) (holding that an officer who develops reasonable suspicion during the course of a lawful traffic stop may continue the detention of the occupants of the vehicle to investigate criminal activity beyond the

scope of the law violation that formed the basis of the initial stop). Cited in support of this holding were three factors developed during the stop: discovery of a BB gun, 100 hydrocodone pills and a credit card bearing the decedent's name. *Slip op.* at 33.

Possession of a BB gun, which is legal, makes it no more or less likely that Appellant had murdered his girlfriend or that he had committed any offense other than the traffic violation. Since Appellant and the decedent were in a relationship, it should come as no surprise that her credit card would be in his vehicle.

The court is simply reaching when it asserts that the hydrocodone pill bottle justified a continuing detention. Investigator Jones thought that "too many pills were missing" from the bottle. This is pure speculation—how many missing pills is too many? The bottle obviously belonged to Appellant and the simplest explanation of the missing pills is that he lawfully took them. There was no evidence justifying a reasonable suspicion that Appellant was engaged in selling hydrocodone.

None of the facts cited by the court justified a detention of Appellant's vehicle beyond that necessary to effectuate the traffic stop. The court was simply fishing for facts that might justify the prolonged

detention. An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. *Florida v. Royer*, 460 U.S. 491, 500 (1983). This limitation means that once the reason for the stop has been satisfied, the stop may not be used as a fishing expedition for unrelated criminal activity. *Ohio v. Robinette*, 519 U.S. 33 (1996) (Ginsberg, J., concurring). Consequently, a detention that is not temporary and reasonably related in scope to the circumstances which justified the interference is unreasonable, and thus violates the Fourth Amendment.

The propriety of the duration of the detention is judged by whether police officers pursued a means of investigation which confirmed or dispelled their suspicions quickly and in a manner that did not exceed the scope of the detention. *Anderson v. State*, 787 S.W.2d 221, 229 (Tex. App.—Fort Worth 1990, no pet.); *Perez v. State*, 818 S.W.2d 512, 517 (Tex. App.—Houston [1st Dist.] 1991, no pet.). The court of appeals failed to realize that the prolonged nature of the detention in this case was not based on a legitimate ongoing investigation but a ploy to "soften up" Appellant and obtain consent to search his residence. The detention was illegal and unreasonable and

the consent to search, following hard on the heels of the stop, was similarly illegal.[2]

<u>APPELLANT'S GROUND FOR REVIEW NO. THREE</u>

**3.     Did the court of appeals err in holding that Appellant's consent to search his residence was not vitiated by the illegal detention?**

<u>Reasons for Review:</u>

Tex. R. App. Pro. 66.3 (c): decided important question of law contrary to Court of Criminal Appeals and Supreme Court decisions.

<u>Arguments and Authorities:</u>

Implicit in the court of appeals' rejection of Appellant's attack on the detention is a rejection of Appellant's point of error asserting that his consent to search his residence was a fruit of the illegal detention. If police obtain evidence as the result of a consensual search during an illegal seizure, a defendant may have the evidence suppressed unless the State proves that the causal relationship between the police

---

[2] A reasonable reader might well wonder why the officers went to all the trouble in this case when a simpler investigative route would have been both efficacious and constitutional. Nothing in the record reflects that Appellant was about to escape and his behavior with Shaun Kaufman indicates that he was taking no steps to conceal the crime. Officers could have simply corroborated details of Kaufman's account and legally obtained a search warrant prior to entering the residence. One might also wonder why the court of appeals went to such lengths to justify the illegal detention, given that a routine investigation would have been both simpler and legal.

misconduct and the defendant's consent is attenuated—that is, the illegal seizure did not taint the otherwise voluntary consent. *Brick v. State,* 738 S.W.2d 676, 681 (Tex. Crim. App. 1987); *Munera v. State,* 965 S.W.2d 523, 532 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd).

Nothing in the record shows any break in the causal relationship between the illegal detention and the consent to search the residence. The consent in fact occurred *during* the illegal detention. Nothing happened between, if between is quite the word, the detention and the consent. Therefore, there is no attenuation to allow consent to be used as a basis for the search. The court of appeals erred in failing to hold that the consent in this case was a fruit of the illegal detention.

<u>APPELLANT'S GROUND FOR REVIEW NO. FOUR</u>

**4.     Did the court of appeals err in holding that Appellant's consent to search his residence was voluntary**:

<u>Reasons for Review:</u>

Tex. R. App. Pro. 66.3 (c): decided important question of law contrary to Court of Criminal Appeals and Supreme Court decisions.

<u>Arguments and Authorities:</u>

The court of appeals held that Appellant's consent to search his residence was otherwise voluntary. *Slip op.* at 42-44. To be voluntary

under the Fourth and Fourteenth Amendments, consent must not be coerced by explicit or implicit means nor by implied threat or covert force. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973); *Meekins v. State*, 340 S.W.3d 454, 458-459 (Tex. Crim. App. 2011). Whether a person's consent to search was voluntary is a question of fact to be determined in each case from the totality of the circumstances of the particular situation. *Reasor v. State*, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000). Factors that a court may examine when determining if a person voluntarily consented to a search include, but are not limited to, the person's age, education and intelligence, whether the consenting person was in custody, whether the person was arrested at gunpoint, whether the person had the option of refusing consent, the constitutional advice given, the length of the detention, the repetitiveness of any questioning and the use of physical punishment. *See Reasor*, 12 S.W.3d at 818. The ultimate question to be determined is whether the individual's will has been overborne and his capacity for self-determination critically impaired, such that his consent to search must have been involuntary. *United States v. Watson*, 423 U.S. 411, 424 (1976). The State must prove voluntariness by clear and convincing evidence. *Meekins*, 340 S.W.3d at 459.

Before Appellant gave his consent, he had been detained by officers at gunpoint. Although they later holstered their weapons, this hardly negates the aggressive nature of the detention. He was held over an hour by officers who had detained him so long for the express purpose of obtaining his consent. His consent was less than unequivocal: "sure, I guess I could." *Slip op*. at 10.

The court of appeals held that the actions of the officers in the gunpoint detention were necessary. That is not the question. Necessary or not, the officers' actions militate against a finding of voluntary consent. Further, no written consent was offered to Appellant and little in way of admonishments were given. The court of appeals clearly erred in failing to hold that Appellant's consent was nothing more than a submission to authority and was involuntary under the circumstances.

**5.     Did the court of appeals err in holding that prosecution argument misplacing the burden of proof as to a person of ordinary temperament was harmless?**

Reasons for Review:

Tex. R. App. Pro. 66.3 (c): decided important question of law contrary to Court of Criminal Appeals and Supreme Court decisions.

Arguments and Authorities:

A prosecutor argued as follows during the punishment hearing:

And, let's assume for a minute, that we believed the latest version of Mr. Rodriguez's stories. The story, the tearful story that he told us here on the witness stand. Then we would have to examine whether he can meet the definition in the Court's charge, that of ordinary temper. But we know that he is a drug addict. He always acted schitzy. And we know from the rest of the testimony that he is not a—

[Defense Counsel] Excuse me.

[Prosecutor] –person of ordinary temper.

[Defense Counsel] Judge, we object to as to whether or not Mr. Rodriguez can meet the burden of ordinary temper. I don't think he has the burden to meet. I believe that if the Court's charge outlining the

law, that rage or anger must be such that a person of ordinary temperament would be enraged, not necessary to the exclusion of anybody else, if they don't have ordinary temper. And my objection is that the state is attempting to set a standard that the law does not require. That's my objection, Your Honor.

[The Court] Okay, I'm overruling the objection. And again, I just remind the jury that this is the argument of the lawyers. The law that is applicable in this case is contained—contained in the jury charge, which will, again, be placed in the jury room for your review.

This is where the attorneys are able to argue to you what they believe the law is, and what they believe the facts are. But you are to be governed by the law and it is stated in the charge.

[Defense Counsel] Judge, I want to be sure my objection is clear.

[The Court] Okay.

[Defense Counsel] I'm not arguing her argument. I'm arguing that's not the law so—

[The Court] I understand.

[Defense Counsel] Yes, ma'am.

[The Court] I'm overruling your objection.

[Defense Counsel] Thank you, ma'am.

(R.VI 25-26).

Appellant argued on direct appeal that this was an erroneous and harmful misstatement of the law. The court of appeals "assumed arguendo" that the prosecutor had misstated the law but then launched into a discussion of why the error was harmless. *Slip op.* at 50-51.

With all due respect, a discussion of the nature of the error is necessary to determine the degree of harm. The prosecutor erroneously stated the law, and what is more, the prosecutor's view of the law has been wrong since 1919.

In *McCartney v. State*, 542 S.W.2d 156, 160 (Tex. Crim. App. 1976), the Court noted that the definition of adequate cause is both objective and subjective. It is objective because it views the alleged provocation through the eyes of an ordinary man; it is subjective because the fact-finder must view from the actor's standpoint in order to determine the condition of mind of the accused at the time of the offense.

The Court further noted:

The only Texas case found that alluded to the objective-subjective nature of the adequate cause definition, *Zimmerman v. State*, (85 Tex. Cr. R 630), 215 S.W. 101 (Cr. App. 1919), affirmed that it is the *ordinary man's response to the alleged provocation that is material, not the*

*epileptic defendant's, but that the jury must place the ordinary man in the defendant's situation.*

542 S.W.2d at 160. (emphasis added).[3]

In *McGhee v. State*, No. 01-09-00147-CR (Tex. App.—Houston [1st Dist.] 2011) (memorandum opinion), the defendant proposed to call an expert witness to testify that he was a person of ordinary temper. The trial court excluded the evidence and the court of appeals held that this ruling was correct, citing *McCartney*:

> Thus, the issue is not whether appellant is a man of ordinary temper; the issue is how the objectively reasonable man would react if placed in appellant's situation. Therefore, the trial court did not err in excluding, on relevancy grounds, the expert's testimony regarding whether appellant was a man of ordinary temper.

*Slip op.* at 27.

The prosecutor asserted in this argument that ordinary temperament was an element of Appellant's burden of proof, not an objective standard against which his conduct was to be measured. Also erroneous was the prosecutor's assertion that Appellant could not meet this burden, not because his conduct during the offense showed lack of

---

[3] The Court found *Zimmerman* "unsatisfactory" on this issue because the main issue was insanity and the defendant raised the sudden passion issue for the first time on appeal. The Court went on to say that most jurisdictions have applied the common-law ordinary man test, *thus ruling out conditions peculiar to the individual that arguable made him easier to provoke.* 542 S.W.2d at 160. (emphasis added).

ordinary temperament, but because of his past conduct (drug addict) and his inherent personality flaws ("schitzy'). Even worse, the prosecutor suggested that Appellant had failed to prove this supposed element of sudden passion, when Appellant was barred by the rules of evidence from presenting expert testimony on this issue. This argument was manifestly improper and clearly contrary to the applicable law.

Neither is the court's resolution of the harm issue correct. Our law is clear that sustaining an objection to improper argument and instructing the jury to disregard the argument is normally sufficient to cure error arising from the improper argument. *See Gardner v. State*, 730 S.W.2d 675, 696 (Tex. Crim. App.1987), *cert. denied*, 484 U.S. 905 (1987). However, the converse is equally true--the overruling of a proper objection places "the stamp of judicial approval" on the improper argument and magnifies the possibility of harm. *See Good v. State*, 723 S.W.2d 734, 738 (Tex. Crim. App. 1986). In other words, rather than curing the error, by overruling the objection the trial court compounds the error.

The chief reason the error was harmless, according to the court, was that the jury charge correctly stated the law. *Slip op*. at 51. This is

true and the charge provided some small ameliorative effect. But whatever curative effect the charge provided was far outweighed by the trial court overruling the objecting and compounding the error. Stated another way, it mattered little what the charge said, the judge told the jury that the prosecutor's argument was correct and was the law. The court of appeals' harm analysis is flawed and such be examined by this Court.

<u>CONCLUSION AND PRAYER FOR RELIEF</u>

WHEREFORE, Appellant prays that his Petition for Discretionary Review be granted.

Respectfully submitted,


/s/ John D. Nation
John D. Nation
State Bar No. 14819700
4925 Greenville, Suite 200
Dallas, Texas 75206
214-800-5160
214-800-5161 (facsimile)


/s/ **ANTHONY D. LYONS**
Anthony D. Lyons
State Bar No. 12741750
320 S. R.L. Thornton Freeway
Suite 300
214-941-1881
214-941-1399 (facsimile)

## CERTIFICATE OF COMPLIANCE

Pursuant to Tex. R. App. Pro. 9.4 (i) (3), I hereby certify that this brief contains 4,273 words, in 14-point, Georgia font.

/s/ John D. Nation
John D. Nation

## CERTIFICATE OF SERVICE

This is to certify that I have mailed a true copy of this brief to Hon. Janice Warder, District Attorney, Cooke County, 101 S. Dixon Street, Suite 309, Gainesville, Texas 76240 via the electronic filing system or to her facsimile number, 940-668-5499, on this 16th day of November 2015.

/s/ John D. Nation
John D. Nation



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-13-00520-CR

JUAN MANUEL RODRIGUEZ-OLIVAS                                    APPELLANT

V.

THE STATE OF TEXAS                                             STATE

----------

FROM THE 235TH DISTRICT COURT OF COOKE COUNTY
TRIAL COURT NO. CR12-00257

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

Appellant Juan Manuel Rodriguez-Olivas appeals his conviction for murder while using a deadly weapon, to-wit: a knife.[2] In five points, Rodriguez-Olivas

---

[1]*See* Tex. R. App. P. 47.4.

[2]*See* Tex. Penal Code § 19.02 (West 2011).

argues that the trial court erred by overruling his motion to suppress evidence; that the evidence was insufficient to support the jury's verdict that he did not act in sudden passion when he stabbed his girlfriend, Linda Barrett, to death; and that the State misstated the law at the punishment phase and that this misstatement was harmful. We will affirm.

## II. BACKGROUND

Shaun Kaufman and his girlfriend, Sandra Mozingo, were working on his car on June 15, 2012. As they test-drove the car, Kaufman saw Rodriguez-Olivas, whom Kaufman knew as an acquaintance through his friend Barrett. Kaufman knew Rodriquez-Olivas as "Juan" and also by his street name, "Mickey." Kaufman also knew his friend Barrett as both Linda Barrett and Linda Burns—she had previously been married to his friend. Kaufman learned that Rodriguez-Olivas's car had broken down and offered to assist.

From there, the three drove to Rodriguez-Olivas's trailer home in order to retrieve some jumper cables. Because Rodriguez-Olivas insisted that he wanted to show Kaufman something, Kaufman followed Rodriguez-Olivas into the trailer home. While there, Rodriguez-Olivas took Kaufman to his bedroom, unlocked a closet, stated something to the effect of "she's going to get [me] caught up," and showed Kaufman a dead body that had been wrapped with some type of plastic wrap in a chair.

Kaufman testified at trial that he was "speechless" as these events transpired and that he knew the body was Barrett's. After Rodriguez-Olivas

2

showed him the body, Kaufman left the trailer home immediately and went back to his car. "I walked off," Kaufman testified. Rodriguez-Olivas followed, and Kaufman gave him a ride back to his car. During the ride, Rodriguez-Olivas showed Kaufman a gun that was tucked into his waistband. After jump-starting Rodriguez-Olivas's car, Kaufman left. En route to his house, Kaufman stopped along the way and told Mozingo what had just happened. The two then retrieved some clothes from Kaufman's house and drove to the apartment of Kaufman's mother, where Kaufman took a Xanax and then proceeded to call 911. Kaufman averred that he went to his mother's apartment to call 911 because he feared that Rodriguez-Olivas might come try to find him at his own residence.

After identifying who he was and where he was calling from, Kaufman told the 911 operator that a man named "Juan" who lived on a street named "Truelove" had just showed him the dead body of his friend "Linda Burns." Not knowing the exact address, he also described Rodriguez-Olivas's trailer home to the 911 operator. According to Kaufman, Rodriguez-Olivas's trailer home was the "only one like it on the block." Kaufman said that he called within thirty minutes of Rodriguez-Olivas's having shown him the body. From there, responding Officer Chris Jones of the Gainesville Police Department drove Kaufman to the police station, where he gave interviews to Jones and Sergeant Daniel Orr. The record indicates that Kaufman arrived at the police station at 5:00 p.m. While there, Kaufman gave a more detailed account of what

3

Rodriquez-Olivas had shown him, including telling them that the closet where he saw Barrett's body was locked with a padlock.

Orr testified that, based on Kaufman's 911 call, he generated "call notes" and broadcast them to all available officers. Orr said that the call notes also included information regarding previous calls made to the police that involved Rodriguez-Olivas and a "Linda Barrett." Orr said that during the time he interviewed Kaufman, other officers had detained Rodriguez-Olivas and had obtained consent to search his residence. Orr said that based on Kaufman's call and interview, he had already begun the process of obtaining a search warrant. Thus, Orr said that he instructed the officers to wait for the search warrant if they smelled the odor of a decomposing body upon entering the trailer home.

Gainesville Police Investigator Jack Jones, who was on duty assisting with the patrol division on June 15, 2012, read the call notes on his mobile computer. Jones testified that he knew "Juan Rodriguez" from previous law-enforcement interactions. From these interactions, Jones also knew that "Juan Rodriguez" lived on Truelove Street and that he dated a woman named "Linda." Jones also knew the make and model of Rodriguez-Olivas's vehicle. Jones went to Rodriguez-Olivas's trailer home and set up surveillance in an attempt to locate Rodriguez-Olivas's vehicle. Jones said that he intended to have a consensual encounter with Rodriguez-Olivas or wait for him to violate some state law in order to stop and question him about Kaufman's report. Jones soon saw Rodriguez-Olivas's silver Lincoln Town Car. Unable to stop the vehicle, Jones questioned a

4

man who had exited the vehicle shortly after Jones saw it. The man told Jones that he did not know the name of the male who was driving the vehicle but that he knew the name of the driver's passenger, "Linda." When Jones asked whether the man was armed, the man expressed that because he was a felon, he could not have a gun, but that he did not know whether the driver of the vehicle had one.

Soon after seeing Rodriguez-Olivas's vehicle the first time, and as Jones and Sergeant John Frith of the Gainesville Police Department talked from their patrol units outside of the trailer home, Rodriguez-Olivas's vehicle drove down Truelove Street again. According to Jones, Frith followed Rodriquez-Olivas and conducted a traffic stop. The record indicates that the traffic stop occurred at 5:07 p.m.

Jones proceeded to the location where Frith had stopped Rodriguez-Olivas. Jones said that upon arriving, Frith informed him that there was possibly a "black pistol" in the vehicle. According to Jones, shortly after he arrived at the traffic-stop location, he requested Rodriguez-Olivas's consent to search the vehicle. Jones said that Rodriquez-Olivas consented. Jones also testified that he later asked Rodriquez-Olivas for consent to search the trailer home, to which Rodriquez-Olivas purportedly stated, "[S]ure, I guess." Jones further averred that Rodriquez-Olivas granted consent to search the closet once Jones, Rodriquez-Olivas, and Frith were inside the trailer home. Inside the closet, Jones found

5

Barrett's body as Kaufman had described—deceased, sitting in a chair, and wrapped with some type of plastic wrap.

In a video taken from Jones's in-car camera, Jones can be seen addressing Rodriguez-Olivas shortly after Frith had made the traffic stop and Rodriguez-Olivas had exited the vehicle. Jones initially asked Rodriguez-Olivas about the person he dropped off earlier. Jones can also be heard saying to Rodriguez-Olivas, "You're sweating profusely."

It is evident from the video that Jones and Rodriguez-Olivas were familiar with each other. At one point, Jones even wiped Rodriguez-Olivas's brow to remove sweat, and Rodriguez-Olivas can be heard saying, "I appreciate it." Jones can then be heard stating to Rodriguez-Olivas, "Juan, you're nervous," to which Rodriguez-Olivas's can be heard replying, "I'm just hot, man." Jones can next be heard asking, "Do you have any dope on you?" Rodriguez-Olivas responded "I've got my pills." At that time, and only three minutes into the stop, Jones asked Rodriguez-Olivas, "That's it? Nothing illegal in the vehicle? You don't mind if I take a look?" Yet again, Jones asked, "You don't mind if I take a look?" Rodriguez-Olivas's response is inaudible, but Jones can next be heard stating, "Alright, step right back here to the rear of the vehicle." Rodriguez-Olivas complied, and Jones began searching the vehicle.

In his search of the vehicle, Jones found a bottle containing over 100 hydrocodone pills. According to statements made by Jones in the video, the bottle's label had been partially torn off. Jones can be heard asking Rodriguez-

6

Olivas, "What are these?" And Rodriguez-Olivas can be heard replying, "Those are my pain pills." There is also an exchange between Jones and Rodriguez-Olivas in the video wherein Rodriguez-Olivas explained to Jones that the receipt for the pills was in the vehicle. Jones can be heard a short time later explaining to a fellow officer that too many pills were missing from the prescription relevant to the fill date and that he suspected Rodriguez-Olivas might be selling them.

Jones also discovered a black BB gun in the vehicle. At one point, Jones can be heard discussing with another officer how "real" the BB gun appeared. Jones also discovered a credit card with the name "Linda Barrett" on it. From there, eleven minutes after the stop, Jones began to focus his attention on finding out the identity of the passenger, who, as Jones can be heard stating in the video, "Ironically, is [named], Linda." Jones can be heard asking the passenger, later determined to be Linda Kuykendall, what different last names she could be known by. He then further questioned her about her identity and whether she had ever been arrested before. Kuykendall's answers are less than clear and, at times, are non-responsive ramblings. Jones can be heard declaring to her at one point, "I need one-word answers."

Jones can further be heard expressing to Kuykendall that she was not under arrest or in any "trouble" but that the officers were "looking for a Linda, to make sure she is okay" and that they needed to determine if she was that Linda. Jones stated to Kuykendall, "If you are her, that's great! If you're not, that's

7

[inaudible]." During his exchange with Kuykendall, Jones can also be heard expressing to her that he thought she was under the influence of drugs.

From the video, it is apparent that Jones and other officers are receiving information regarding Kaufman's interview while they are detaining Rodriguez-Olivas and Kuykendall. Jones can be heard expressing some confusion to another officer over the passenger of Rodriguez-Olivas's vehicle being named "Linda," and the other officer can be heard stating that Kaufman "had definitely seen a body," which was "covered in blood," and that the body was in "the trailer house."

At 5:27 p.m., Jones told Rodriguez-Olivas that he was not under arrest and that he and Kuykendall were free to sit in his air-conditioned patrol vehicle, out of the sun. In explaining why he was detaining the two, Jones told Rodriguez-Olivas that the officers were looking for a Linda who is "supposed to be with you," but that it was apparently "not this Linda."

Rodriguez-Olivas explained that he had previously been in a relationship with a "Linda Barrett" but that they had previously fought and she had left him "weeks ago." Jones then asked Rodriguez-Olivas when the last time he had seen Barrett was, and Kuykendall interjected that Rodriguez-Olivas and Barrett had fought a month before. Rodriguez-Olivas can be heard telling Jones that he had not seen Barrett for more than a week. Rodriguez-Olivas can also be heard telling Jones that he believed that Barrett had been cheating on him.

8

At 5:37 p.m., Jones asked Kuykendall if she would allow him to take her picture and send it to other officers to determine whether she was in fact the "Linda" they were looking for. Kuykendall complied. While they awaited the results, it became apparent again that Jones and Rodriguez-Olivas were familiar with each other. The conversation could only be described as cordial. At one point, Rodriguez-Olivas can be heard asking, "How have you been, Mr. Jones?"

At 5:45 p.m., as Jones awaited information on Kuykendall's identity, he allowed Rodriguez-Olivas and Kuykendall to exit the patrol unit because they had asked to be allowed to smoke cigarettes. As the two sat on the curb, Jones retrieved cigarettes and a lighter from Rodriguez-Olivas's vehicle. The two then smoked cigarettes while sitting on the curb in the shade of a tree. During this time, Kuykendall made several phone calls on her cell phone. She can be heard explaining to someone that the police "were really nice and just doing their job."

At 6:00 p.m., while Rodriguez-Olivas and Kuykendall continued smoking, Jones can be heard having a conversation with another officer on his cell phone wherein he explains that he has a good rapport with Rodriguez-Olivas and that he believed that instead of detaining Rodriguez-Olivas and Kuykendall any longer, he could simply ask Rodriguez-Olivas for consent to search his trailer home. From there, Jones again asked Rodriguez-Olivas about Barrett. Rodriguez-Olivas can be heard giving a phone number to Jones that was allegedly Barrett's, but the phone number apparently failed to dial a connecting telephone. Rodriguez-Olivas again expressed to Jones that he had not seen

9

Barrett in more than a week, even interjecting that he had recently gone to her aunt's house in the middle of the night looking for her.

Jones again can be heard speaking to another person on his cell phone. During this conversation, Jones can be heard explaining that it appeared as though the "Linda" who was with Rodriguez-Olivas was not the same person as Barrett, whose credit card had been found in the vehicle.

At 6:16 p.m., the following exchange occurred between Jones and Rodriguez-Olivas,

Jones:   I'm trying to speed this up and get you out of here.

Rodriquez-Olivas:   All right.

Jones:   Okay.

Rodriguez-Olivas:  Okay.

Jones:   With your permission, I want to go by your house with you and me and we'll make sure Linda is not there.  That's all I want to do.

Rodriquez-Olivas:   Oh, really?

Jones:   All I want to do is make sure Linda is not at your house and then we are going to leave.

Rodriquez-Olivas:  Well, I mean I, I gotta go to work later (inaudible).

Jones:   Work with me. Dude, we're not a block away.   [Jones motioning to his left.]

Rodriquez-Olivas:   Sure, I guess I could.

Jones:   Thank you.

From there, Jones allowed Rodriguez-Olivas to lock his vehicle. While attempting to do so, they discovered that his vehicle's battery had died. Jones then instructed Rodriguez-Olivas to take his medication from the vehicle so that "nobody takes it." Then, Rodriguez-Olivas followed Jones to the patrol vehicle. As Jones entered the vehicle from the front, driver's side door, Rodriguez-Olivas can be seen walking to the passenger side of the vehicle to enter the backseat. In the video's audio, and less than four minutes later, Jones can be heard entering the trailer home with Rodriguez-Olivas. Video from Frith's in-car camera shows that Frith was awaiting Jones and Rodriguez-Olivas, and as the two arrived, Rodriguez-Olivas unlocked the door, and the two officers followed Rodriguez-Olivas in. Again from Jones's video, audio of the conversation between Jones and Rodriguez-Olivas while in the trailer home can be heard. At one point, Jones can be heard asking, "What is that smell?" Rodriguez-Olivas can be heard explaining that the sewer in the trailer home was backed up. Rodriguez-Olivas can also be heard stating "that's ours" in response to Jones's question of where Rodriguez-Olivas and Barrett's bedroom was. Then Jones can be heard asking, "What's in here?" Rodriguez-Olivas responded, "That's just a closet." Jones asked, "Can I see in there?" Rodriguez-Olivas replied, "Yes." Moments later, Jones can be heard stating, "Turn around."

According to Jones's testimony, at the moment he said "turn around," he was handcuffing Rodriguez-Olivas and placing him under arrest. Jones testified at the suppression hearing that the subject of whether Rodriguez-Olivas was free

11

to leave at any time during the stop and subsequent detention "never came up." Jones said that Rodriguez-Olivas did express concern about making it to work on time, but that he allowed Rodriguez-Olivas to use Jones's cellphone to call work and tell them he would be late. At trial, Jones testified that although the subject of Rodriguez-Olivas's being free to leave never came up, Rodriguez-Olivas was not free to leave because the officers had reasonable suspicion to detain Rodriguez-Olivas for further investigation past the initial traffic stop.

By Jones's account, while en route to Rodriguez-Olivas's residence, Jones spoke with Orr and received instructions that if he got to the residence and smelled a decomposing body, he should secure the scene and wait for a warrant to enter the residence to search it. Before arriving at the trailer home, Rodriguez-Olivas informed Jones that the home was filthy and odoriferous due to animals. Jones said that as Rodriguez-Olivas opened the door, he smelled a strong odor of animal feces and urine. Jones recalled that once inside, Rodriguez-Olivas pointed Jones and Frith to one of the bedrooms, stating to them "that's ours." When they entered the bedroom, Jones smelled a strong odor of sewage in addition to the animal feces and urine smells.

Jones described the entry into the trailer home,

Once we made our way in through the front door, we turned back north through the front door, went into a master bedroom that he identified as, I believe it was our bedroom or that's our bedroom. And inside this bedroom, I observed open sewage lines, along with inoperable commode full of human waste. It was the foul -- the odor was extremely foul.

12

Jones said that he was unable to distinguish a decomposing body smell from the other odors. Once in the bedroom, Jones noted that there was a closet, which was locked. Jones said that he asked Rodriguez-Olivas if he could look inside the closet. At trial, Jones described the opening of the closet through this colloquy,

[Prosecutor]: Where was it and what was it?

[Jones]: On the northeast corner of this master bedroom that [Rodriquez-Olivas] claimed as -- as ours, there was a closet with a clasp and a lock on it. [Rodriquez-Olivas] was asked about this closet, and I informed him that I wanted to look inside of it.

[Prosecutor]: What did he say when you told him you wanted to look inside of it?

[Jones]: He began to reach into his shorts' pocket and pull out a set of keys.

[Prosecutor]: What did he do then?

[Jones]: The first key he used he attempted to unlock the lock and it failed. The second key on the same set of key rings opened the lock. And as he was removing the lock from the clasp and the key, the door opened up.

[Prosecutor]: What did you do when the door opened up?

[Jones]: I looked inside the closet.

[Prosecutor]: What did you see?

[Jones]: I saw a body of a deceased female that was -- appeared to be wrapped in some sort of clear plastic. She was in a chair, slumped over, kind of to the back, towards the left side, towards the east side. She appeared to be there for several days. That's when a foul odor came across me.

13

> All this was within seconds. All this occurred less than one minute.

[Prosecutor]: And you said a foul odor, something on top of the odors you had already smelled; is that correct?

[Jones]: I didn't smell that until the closet door was opened, yes, sir.

[Prosecutor]: That was the smell of a decomposing body; is that correct?

[Jones]: You could definitely smell more than what I had smelled when I walked into the front of the residence.

Frith testified at the suppression hearing and at trial. Frith said that he became involved in this case after reviewing the call notes regarding Kaufman's 911 call. After going to the apartment of Kaufman's mother and speaking with Officer Chris Jones, Frith proceeded to the Truelove Street location and spoke with Investigator Jones. As the two spoke from their patrol vehicles, Frith said that they saw Rodriguez-Olivas's vehicle drive by. Frith followed the vehicle and eventually made a traffic stop, allegedly based on Rodriguez-Olivas's failure to use his turn signal twice. Because Frith had been informed that Rodriguez-Olivas might have a gun, Frith approached the vehicle with his service weapon drawn but concealed.

Video from Frith's in-car camera, which was played for the jury, shows Frith approaching the vehicle with his service weapon drawn and behind his back. After making contact with Rodriguez-Olivas, and after both Rodriguez-Olivas and Kuykendall can be seen placing their hands outside the vehicle, Frith

14

re-holstered his service weapon. At this same time, two other officers arrived, one of them being Jones. In the video, Jones can also be seen approaching the vehicle with his service weapon drawn and down to his side. As he made contact with the passenger, Jones re-holstered his weapon. Within seconds, however, Jones can be seen quickly drawing his weapon and declaring, "Let me see your hands, Juan!" Seconds later, Jones re-holstered his weapon and assisted Kuykendall from the vehicle.

Rodriguez-Olivas can be seen getting out of the vehicle, as can Kuykendall, who was now being questioned by Jones. Frith can also be seen conducting a brief "pat down" of Rodriguez-Olivas, and quickly searching the immediate "grab area" of the vehicle. Frith's testimony was consistent with the images depicted on the video. At trial, Frith said that after he stopped Rodriguez-Olivas for the traffic infractions, Rodriguez-Olivas was not free to leave but was also not under arrest.

Frith averred that because Jones had informed him that Rodriguez-Olivas had consented to a search of his residence, he proceeded there while Jones stayed with Rodriguez-Olivas. Later, Jones and Rodriguez-Olivas arrived. According to Frith, Rodriguez-Olivas let the two officers into the trailer home. Much like Jones's testimony, Frith described how Rodriguez-Olivas led the two officers through the odor-filled trailer home, eventually stopping in a bedroom, where Rodriguez-Olivas unlocked and opened a closet. Frith testified that he saw a dead body inside and that Rodriguez-Olivas was placed under arrest.

15

Dallas County Chief Medical Examiner Jeffrey Barnard testified that he conducted the autopsy on the body found in Rodriguez-Olivas's closet. Barnard's autopsy revealed that Barrett's body was in an advanced state of decomposition. The body had been wrapped in a plastic bag, along with bloody sheets, some clothing, personal items, and jewelry. By Barnard's account, Barrett had been injured with a dual-edged knife more than thirty times, with wounds proceeding from her head down to her extremities. Some of the wounds were "defensive" wounds. Barnard testified that even the more shallow wounds would have required a fair amount of force but that one wound was five and one-half inches deep and would have required a lot of force—only the blade hitting bone stopped its penetration going further.

Barnard averred that Barrett's uterus was enlarged and her endometrium thickened, but he could not determine whether she was pregnant at the time of death because of the advanced state of decomposition. Toxicology revealed the presence of some ethanol, which was consistent with having consumed alcohol prior to death but which could also have merely been a product of decomposition. Barnard concluded that Barrett died as a result of homicidal violence from multiple sharp-force injuries. Barnard explained that in general, stab wounds are inflicted by an attacker in close proximity to the victim. In his opinion, all of the injuries were inflicted closely in time, although due to the degree of decomposition, Barnard could not rule out some of the injuries having been inflicted post-mortem.

16

Carl Wilson testified at trial that he had been arrested on June 6, 2012, for aggravated assault. While in jail, he said that he came in contact with Rodriguez-Olivas. By Wilson's account, he and Rodriguez-Olivas were talking one morning in their cell and Rodriguez-Olivas told Wilson that he had argued with his girlfriend because she had broken a flat-screen television and a window, after which the neighbors called the police. Wilson averred that Rodriguez-Olivas told him that later on, "she just wouldn't shut up," so he stabbed her in the head.

Wilson said Rodriguez-Olivas was "acting crazy" while in jail. Wilson testified that Rodriguez-Olivas told him that after he stabbed Barrett, he tried to electrocute her with an extension cord in an effort to bring her back to life. Rodriguez-Olivas also allegedly claimed to Wilson that he and his dog ate some of Barrett's brains. Rodriguez-Olivas told Wilson that after he killed Barrett, he put the body in the closet and went to work. Rodriguez-Olivas also claimed to Wilson that he had blood on his clothes when he was pulled over and that he had intended to use a brick to sink Barrett's clothes in a river but had forgotten to do so. Wilson said that Rodriguez-Olivas showed no emotion when he was talking about the murder. Wilson recalled that after Rodriguez-Olivas spoke with his attorney, he told Wilson that he was going to plead insanity at trial. Wilson contacted the police and told them what Rodriguez-Olivas had said.

Gainesville Police Investigator Chris Garner testified that he participated in the interview of Shaun Kaufman at the police department  Later, Garner attempted to interview Rodriguez-Olivas. After reading Rodriguez-Olivas his

17

*Miranda* warnings, Rodriguez-Olivas said that he did not want to talk. Garner said that he photographed defensive-type scratches and cuts on Rodriguez-Olivas's arms and hands. Garner said that when Rodriguez-Olivas received his *Miranda* warnings, and after Rodriguez-Olivas stated that he did not want to talk, he did not ask Rodriguez-Olivas any further questions but that as they were filling out written *Miranda* warnings, Rodriguez-Olivas volunteered that "it was self-defense."

Garner testified that he also participated in executing the search warrant on Rodriguez-Olivas's residence that was obtained shortly after Barrett's body was found. Garner bagged as evidence various items, including a double-edged knife and a folder of paperwork addressed to Barrett from All Babies Born Alive, a women's center in Gainesville. The paperwork, which had blood on it, stated that Barrett was in the seventh week of pregnancy and that she did not want an abortion.

Texas Ranger Ron Pettigrew testified that he responded to a request to assist the investigation. Pettigrew said that when he arrived, he observed Garner's attempt to interview Rodriguez-Olivas; that he saw Rodriguez-Olivas decline to talk after being read his *Miranda* rights; and that he heard Rodriguez-Olivas later volunteer that it was "self-defense" as Garner was filling out the *Miranda* paperwork.

Pettigrew said that he also went to the trailer home to assist in executing the search warrant and to photograph the scene. Pettigrew explained the

18

images that depicted the condition of Rodriguez-Olivas's residence, which the State introduced and published for the jury. Pettigrew pointed out various blood droplets around Rodriguez-Olivas's residence, including on the floors, walls, and ceiling. Pettigrew also described a bloody double-edged knife that was found as well as papers and receipts in Barrett's name.

The defense called Edna Collins, Barrett's aunt and foster sister, who testified that she also knew Rodriguez-Olivas during the couple's two-plus year relationship. Collins said that she last saw Rodriguez-Olivas roughly four days before he killed Barrett. According to Collins, when the couple would fight, Barrett would come to Collins's house and Rodriguez-Olivas would come over looking for her. Collins said that Rodriguez-Olivas would usually show up late at night.

Collins testified that Barrett had lived on Truelove Street with Rodriguez-Olivas for more than a year and that the last time she saw Barrett, Barrett was upset because she and Rodriguez-Olivas had been arguing. Collins said that on that occasion, Barrett's shirt had been torn and she had scratches on her neck. Collins testified that when Barrett and Rodriguez-Olivas fought, it was usually because he had accused her of cheating on him. Collins said that Rodriguez-Olivas was very jealous and possessive of Barrett.

According to Collins, she frequently talked to Barrett about breaking off her relationship with Rodriguez-Olivas. The last time Collins saw her, Barrett said that Rodriguez-Olivas was doing drugs; Collins asked Barrett to stay with her and

19

to avoid Rodriguez-Olivas, but Barrett told Collins that everything would "be okay" because she loved him and was pregnant.

The defense also called Christina Davis, Barrett's friend. Davis said that Rodriguez-Olivas came to her home on June 15, 2012, and said something about Barrett cheating on him, which Davis testified was not true. Davis said that Rodriguez-Olivas also claimed that Barrett had run away with another guy, but Davis believed that Barrett had not done so. Davis said that she did not approve of Rodriguez-Olivas because she thought he was abusive to Barrett and that he did drugs. Davis recalled that about a month before Barrett was killed, she made Rodriguez-Olivas leave her house after he came by and wanted to "shoot up."

Rodney Simpson also testified for the defense. Simpson averred that he knew Barrett; that he had previously had a sexual relationship with her and that the two often "hung out," but that they did not have a "relationship" during the time she dated Rodriguez-Olivas. Specifically, Simpson denied having any relationship with Barrett in April 2012. Simpson testified that he knew Vance Burns, who had been Barrett's boyfriend and who she married after he went to the penitentiary. Simpson also averred that Barrett was not having a sexual relationship with their mutual, married friend.

Simpson testified that he saw Rodriguez-Olivas in a convenience store in March 2012 and that Rodriguez-Olivas threatened him and told him he had better "watch his back." Simpson said that he saw him again at an auto shop a couple

20

of days later and that Rodriguez-Olivas apologized for the incident in the convenience store.

Rodriguez-Olivas testified in his own defense.  According to Rodriguez-Olivas, he and Barrett intended to get married and she was pregnant with their child.  Rodriguez-Olivas said that after a home test indicated Barrett's pregnancy, she went to All Babies Born Alive to confirm.  From there, Barrett attended a follow-up appointment.  Rodriguez-Olivas claimed that after learning of Barrett's pregnancy, he "slowed down" his drug use and sought a second job to support the expected baby.  Rodriguez-Olivas averred that he and Barrett had problems; that they argued about his drug use; and that they had once argued before she went to an All Babies Born Alive appointment because she had said something about taking a pill to abort the baby, and he wanted her to have the baby.

Rodriguez-Olivas testified that he killed Barrett at their trailer home with a knife.  By Rodriguez-Olivas's account, Barrett had been at home the night before, but as he was preparing to shower, he heard the dog barking.  Rodriguez-Olivas said that first he called out for Barrett, but she did not respond.  After seeing movement outside, Rodriguez-Olivas said that he watched Barrett leave the residence, walk around the corner, and then "jump" into a parked car with "a tall black dude."  Rodriguez-Olivas said that he thought he recognized the driver as Simpson.  After they drove away, Rodriguez-Olivas said that he went back inside and became sad after thinking about Barrett having left. According to Rodriguez-Olivas, Barrett had developed a pattern of leaving unexpectedly in the middle of

the night, when he wasn't looking.  Then she would come home in the morning and say she had been at Collins's.

Rodriguez-Olivas testified that on that specific night, as he watched television, he cried, and that he was unable to fall asleep.  He drove to Collins's house in the middle of the night but discovered that Barrett was not there.  Rodriguez-Olivas said that Barrett eventually came home a little after sunrise the next day and claimed that she had been at Collins's house.

Rodriguez-Olivas said that he told Barrett to leave because he was mad that she had lied to him, but Rodriguez-Olivas said that she would not leave.  Instead, according to Rodriguez-Olivas, Barrett went into the bedroom, and he followed.  From there, Barrett left the bedroom, and Rodriguez-Olivas said that he thought she was leaving again, but instead she came back with a knife.  Rodriguez-Olivas testified that Barrett pointed the knife at him, and he told her again to leave, claiming that he knew she was not at Collins's house and that she had been with Simpson the night before.  Rodriguez-Olivas said that Barrett continued to insist that she was at Collins's, so Rodriguez-Olivas said he began to "escort" her toward the living room but that she began poking and stabbing at him with a knife.

Rodriguez-Olivas testified that he jumped back, but that Barrett lunged at him with the knife, cutting him on his hands.  Rodriguez-Olivas said that the knife she had was a different knife than the knife shown to the jury.  Rodriguez-Olivas averred that he was able to take the knife away from her and that he continued

22

asking her to leave as he cried, "[W]e're supposed to be getting married, what about the baby?" By Rodriguez-Olivas's account, Barrett replied to him, "I killed the damn baby" and declared that she had been cheating on him with Simpson; that Rodriguez-Olivas could not satisfy her sexually; and that he was "nothing, nobody." Rodriguez-Olivas said that Barrett told him that she cheated on him with Simpson in the couple's bed.

Rodriguez-Olivas testified that at that moment, he "lost it [and] stabbed her." He said that he did not know how many times he stabbed her and that she did not fight him or scream as he stabbed her, but that she did say "sorry." Rodriguez-Olivas stated that he had never before felt the way he felt when he "lost it"; that he did not think about what he was doing as he stabbed Barrett; and that he was unable to reflect at all during that moment. He also said, however, that at "one point" his attack was in self-defense. Rodriguez-Olivas said that he felt that his actions were in self-defense because he "felt tremendous pain, physical pain, and [he didn't] see a difference in what [he] was feeling that day [than] from having a car accident."

Rodriguez-Olivas said that when he was stabbing Barrett, he was not in fear for his life, but that instead, he was "mad" and "sad." Rodriguez-Olivas claimed that he did not realize what he had done until the following morning, when he woke up on the couch, walked into the bedroom, and saw her body. He averred that he did not know what he was going to do with the body and that he wanted to tell his family but just "wasn't even thinking about it." Rodriguez-Olivas

23

further averred that Collins was lying about whether he had gone to her house on the day of his arrest to ask her if she had seen Barrett.

Rodriguez-Olivas claimed that when he saw Kaufman on the day of his arrest, Kaufman had come to him wanting some of his prescription Xanax pills. Rodriguez-Olivas said he did not remember showing Barrett's body to Kaufman. Rodriguez-Olivas did, however, recall opening the closet door to get Kaufman some pills, allegedly Xanax and hydrocodone, and he surmised that Kaufman could have seen Barrett's body then. He specifically denied that he ever told Kaufman that "she [is] going to get me caught up."

Rodriguez-Olivas said that he did not remember talking to Wilson while in jail and that he believed Wilson was also lying. Rodriguez-Olivas acknowledged, however, that it was "kind of weird" that Wilson knew that Rodriguez-Olivas had stabbed Barrett in the head, given "that [information] wasn't in the paper." Rodriguez-Olivas agreed that Barrett's family tried to get her to leave him. And he averred that he was "jealous to a certain point," but only if she left the house or had a friend in.

Rodriguez-Olivas averred that he was using methamphetamine "[q]uite frequently" before Barrett's murder. By his own account, Rodriguez-Olivas used methamphetamine multiple times a week during the time leading up to Barrett's death, but he said that he was not under the influence of methamphetamine when he killed her. Rodriguez-Olivas said that the "only" drug he had taken prior to stabbing Barrett was Xanax. And Rodriguez-Olivas averred that he had "cut

24

down" his drug use after learning of Barrett's pregnancy. He testified, however, that he could not maintain full-time employment at his family's restaurant because his drug use made him slow and his family was upset that he was using drugs.

Rodriguez-Olivas testified to his recollection of the traffic stop. He averred that he signaled at every turn that day; that he did not voluntarily give consent to search his car; and that investigator Jones was lying about whether he had given consent to search his residence. Specifically to the consent to search his car, he said that he believed that he "couldn't tell [the officers] no." Rodriguez-Olivas stated that he was worried when he saw the officers pull their guns as they approached his vehicle and that he believed that he was under arrest. Rodriguez-Olivas said that he was intimidated because three officers were present during the stop, that he was hot and tired, that he did not feel that he could leave, and that although he needed to go to work, the officers would not let him. He further averred that he did not believe he could withhold consent to search his house.

The jury returned a guilty verdict, and after the punishment phase, the trial court submitted a definition for sudden passion in its charge. The jury assessed punishment of life imprisonment. The trial court entered judgment accordingly, and this appeal followed.

### III. DISCUSSION

In his first, second, and third points, Rodriquez-Olivas challenges the trial court's order denying his motions to suppress.

### A.     Standard of Review on Motion to Suppress

We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard of review.  *Amador v. State*, 221 S.W.3d 666, 673 (Tex. Crim. App. 2007); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). In reviewing the trial court's decision, we do not engage in our own factual review.  *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *Best v. State*, 118 S.W.3d 857, 861 (Tex. App.—Fort Worth 2003, no pet.).   The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.  *Wiede v. State*, 214 S.W.3d 17, 24–25 (Tex. Crim. App. 2007); *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000), *modified on other grounds by State v. Cullen*, 195 S.W.3d 696 (Tex. Crim. App. 2006).   Therefore, we give almost total deference to the trial court's rulings on (1) questions of historical fact, even if the trial court's determination of those facts was not based on an evaluation of credibility and demeanor, and (2) application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Amador*, 221 S.W.3d at 673; *Montanez v. State*, 195 S.W.3d 101, 108–09 (Tex. Crim. App. 2006); *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex. Crim. App. 2002).  But when application-of-law-to-fact questions do not turn on the credibility and demeanor of the witnesses, we review the trial court's rulings on those

26

questions de novo. *Amador*, 221 S.W.3d at 673; *Estrada v. State*, 154 S.W.3d 604, 607 (Tex. Crim. App. 2005); *Johnson*, 68 S.W.3d at 652–53.

Stated another way, when reviewing the trial court's ruling on a motion to suppress, we must view the evidence in the light most favorable to the trial court's ruling. *Wiede*, 214 S.W.3d at 24; *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the record is silent on the reasons for the trial court's ruling, we imply the necessary fact findings that would support the trial court's ruling if the evidence, viewed in the light most favorable to the trial court's ruling, supports those findings. *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *see Wiede*, 214 S.W.3d at 25. We then review the trial court's legal ruling de novo unless the implied fact findings supported by the record are also dispositive of the legal ruling. *Kelly*, 204 S.W.3d at 819.

We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

## B. An Investigative Detention

In part of his first, second, and third points, Rodriguez-Olivas argues that the trial court erred by finding that the officers in this case legally detained him. Rodriguez-Olivas argues that the officers did not simply detain him, but rather arrested him without probable cause.

27

The State responds that what transpired on June 15, 2012, was an evolving investigative detention that began as both a legal traffic stop and, independently, an investigative detention based on the information provided by Kaufman and known by Jones. The State further argues that after Frith stopped Rodriguez-Olivas, a series of consensual searches revealed a growing amount of evidence that, under the totality of circumstances, gave Jones reasonable suspicion to continue to detain Rodriguez-Olivas, and that once Rodriguez-Olivas unlocked the closet and let Jones search it, then Jones placed Rodriguez-Olivas under arrest. Thus, the State argues, the trial court did not err by overruling Rodriguez-Olivas's motions to suppress. We agree with the State.

### 1. The Record

As a preliminary matter, we note that although neither party expressly addresses the issue in their briefing, both Rodriguez-Olivas and the State address evidence adduced at the suppression hearing and at trial in support of their positions regarding the trial court's ruling on Rodriguez-Olivas's motions to suppress. In determining whether the trial court's ruling on a motion to suppress is supported by the record, a reviewing court generally considers only the evidence adduced at the hearing on the motion unless the suppression issues have been consensually relitigated by the parties during the trial on the merits. *Rachal v. State,* 917 S.W.2d 799, 809 (Tex. Crim. App.), *cert. denied*, 519 U.S. 1043 (1996); *Dang v. State*, 99 S.W.3d 172, 179 (Tex. App.—Houston [14th Dist.] 2002, reversed on other grounds by 154 S.W.3d 616 (Tex. Crim. App.

28

2005). Because the parties in this case consensually relitigated the suppression issues at trial, and because both parties refer to evidence adduced at both the suppression hearing and at trial, we will examine the evidence from both sources in our review of these issues.

## 2. Investigative Detentions

The Fourth Amendment protects against unreasonable searches and seizures by government officials. U.S. Const. amend. IV; *Wiede*, 214 S.W.3d at 24. To suppress evidence because of an alleged Fourth Amendment violation, the defendant bears the initial burden of producing evidence that rebuts the presumption of proper police conduct. *Amador*, 221 S.W.3d at 672; *see Young v. State*, 283 S.W.3d 854, 872 (Tex. Crim. App.), *cert. denied*, 558 U.S. 1093 (2009). A defendant satisfies this burden by establishing that a search or seizure occurred without a warrant. *Amador*, 221 S.W.3d at 672. Once the defendant has made this showing, the burden of proof shifts to the State, which is then required to establish that the search or seizure was conducted pursuant to a warrant or was reasonable. *Id.* at 672–73; *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005); *Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005).

Whether a search is reasonable is a question of law that we review de novo. *Kothe v. State*, 152 S.W.3d 54, 62 (Tex. Crim. App. 2004). Reasonableness is measured by examining the totality of the circumstances. *Id.* at 63. It requires a balancing of the public interest and the individual's right to be

29

free from arbitrary detentions and intrusions.  *Id.*  A search conducted without a warrant is per se unreasonable unless it falls within one of the "specifically defined and well-established" exceptions to the warrant requirement.  *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim. App.), *cert. denied*, 540 U.S. 1004 (2003); *see Best*, 118 S.W.3d at 862.

A detention, as opposed to an arrest, may be justified on less than probable cause if a person is reasonably suspected of criminal activity based on specific, articulable facts.  *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880 (1968); *Carmouche v. State*, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000).  An officer conducts a lawful temporary detention when he has reasonable suspicion to believe that an individual is violating the law.  *Crain v. State*, 315 S.W.3d 43, 52 (Tex. Crim. App. 2010); *Ford*, 158 S.W.3d at 492.  Reasonable suspicion exists when, based on the totality of the circumstances, the officer has specific, articulable facts that when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person is, has been, or soon will be engaged in criminal activity.  *Ford*, 158 S.W.3d at 492.  This is an objective standard that disregards any subjective intent of the officer making the stop and looks solely to whether an objective basis for the stop exists.  *Id.*

Moreover, the detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, "the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists."  *Hoag v. State,*

30

728 S.W.2d 375, 380 (Tex. Crim. App. 1987); *see also United States v. Hensley*, 469 U.S. 221, 232–33, 105 S. Ct. 675, 681–82 (1985) (holding that officer may detain suspect based upon police bulletin so long as issuing entity has reasonable suspicion to justify detention); *Illinois v. Andreas*, 463 U.S. 765, 771 n.5, 103 S. Ct. 3319, 3324 n.5 (1983) ("Where law enforcement authorities are cooperating in an investigation, as here, the knowledge of one is presumed shared by all."); *Derichsweiler v. State*, 348 S.W.3d 906, 915 (Tex. Crim. App.), *cert. denied*, 132 S. Ct. 150 (2011) ("[T]he detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, the cumulative information known to the cooperating officers at the time of the stop is to be considered.") (internal citations omitted). Furthermore, information provided to police from a citizen-informant who identifies himself and may be held to account for the accuracy and veracity of his report may be regarded as reliable. *Derichsweiler*, 348 S.W.3d at 914–15 (reasoning that citizen-informant who called 911, providing who he was and what he had observed, sufficiently reliable information to support investigative detention by police who had not observed suspicious conduct). In such a scenario, the only question is whether the information that the known citizen-informant provides, viewed through the prism of the detaining officer's particular level of knowledge and experience, objectively supports a reasonable suspicion to believe that criminal activity is afoot. *Id.*; *Woods v. State*, 956 S.W.2d 33, 38 (Tex. Crim. App. 1997).

### 3. Jones Detained Rodriguez-Olivas

Here, the cumulative information known to cooperating officers at the time Frith stopped Rodriguez-Olivas supports the trial court's implicit conclusion that the totality of the circumstances supported the officers in this case detaining Rodriguez-Olivas past the time necessary to effectuate the traffic stop. At the time Frith initiated the traffic stop, Rodriguez-Olivas was driving a vehicle known by Jones as a vehicle that "Juan," who dated a "Linda" and lived on "Truelove Street," drove. The vehicle had twice been seen by cooperating officers driving down Truelove Street in close proximity to a trailer home that officers had placed under surveillance. The officers were watching the trailer home because Kaufman had reported that a "Juan," who lived on Truelove Street in a trailer home, had shown him the dead body of his friend, whose first name was "Linda." Kaufman had described the trailer home to police, and testified that the trailer home was the "only one like it on the block." And Kaufman had availed himself to the police by accompanying officers to the police station to give a detailed report, including information that Rodriguez-Olivas possessed what appeared to him to be a pistol. In fact, Kaufman was with cooperating officers at the police station at the time Rodriguez-Olivas was stopped. *See Derichsweiler*, 348 S.W.3d at 914–15 ("[I]nformation provided to police from a citizen-informant who . . . may be held to account for the accuracy and veracity of his report may be regarded as reliable.").

Upon stopping Rodriguez-Olivas, the officers learned in short order that the vehicle was in fact being driven by a "Juan" and that he was in possession of what Frith described as a "black pistol" that was later identified only as a BB gun, albeit one that resembled an actual firearm to the officers. These additional facts served as further information known to the cooperating officers as reason to continue to detain Rodriguez-Olivas past the initial traffic stop because these facts corroborated Kaufman's story. *See Hill v. State*, 303 S.W.3d 863, 872 (Tex. App.—Fort Worth 2009, pet. ref'd) (holding that an officer who develops reasonable suspicion during the course of a lawful traffic stop may continue the detention of the occupants of the vehicle to investigate criminal activity beyond the scope of the law violation that formed the basis of the initial stop).

Within three minutes, and as we will address further below, Rodriguez-Olivas consented to the search of his vehicle. Upon searching the vehicle, Jones found the BB gun, over 100 hydrocodone pills that Jones suspected were being sold by Rodriguez-Olivas, and a credit card with the name "Linda Barrett" on it. These additional facts served to justify the prolonging of the investigative detention. *See id.* ("[A]n officer may rely on all the facts ascertained during the course of his contact with a detainee to develop articulable facts that would justify a continued detention.").

After searching the vehicle, Jones's investigation turned to identifying Kuykendall. As the video from Jones's in-car camera demonstrates, Jones and the detaining officers were initially confused by the fact that Kuykendall's first

33

name was "Linda." As Jones questioned Kuykendall, a task made difficult by her rambling responses and evasive answers, he and other officers contacted the officers who were interviewing Kaufman in order to determine if she was the "Linda" whom Kaufman believed he had seen in Rodriguez-Olivas's closet. During this time, both Rodriguez-Olivas and Kuykendall discussed that Rodriguez-Olivas and another "Linda," who Rodriguez-Olivas's had dated, had argued previously. Rodriguez-Olivas also volunteered that he believed that Barrett had cheated on him.

At this point in time, Jones, along with cooperating officers, knew that they had detained a "Juan," who lived on Truelove Street in a trailer home and who had dated a "Linda." They further knew that "Juan" possessed what appeared to be a pistol and that he had argued with Barrett previously. All of these facts were consistent with Kaufman's story. Thus, Jones continued to be justified in detaining Rodriguez-Olivas for further investigation. *See Mohmed v. State*, 977 S.W.2d 624, 628 (Tex. App.—Fort Worth 1998, pet. ref'd) ("An officer is entitled to rely on all of the information obtained during the course of his contact with the citizen in developing the articulable facts which would justify a continued investigatory detention.").

While still in the process of determining Kuykendall's identity, Jones asked Rodriguez-Olivas for consent to search his residence, to which Rodriguez-Olivas can be heard on video replying, "Sure, I guess." *See Meekins v. State*, 340 S.W.3d 454, 458 (Tex. Crim. App. 2011) (holding trial judge did not err by finding

that driver's response of "I guess" demonstrated consent to search). Within seconds of entering the trailer home, the audio from Jones's microphone demonstrates that Jones asked whether he could see what was in the closet, and Rodriguez-Olivas said, "Yes."

Citing to cases related to the area of law concerned with whether a person is in custody for purposes of the admissibility of statements against one's interest at trial, Rodriguez-Olivas argues that the officers were not simply detaining him, but rather had in fact arrested him without probable cause. See *Stansbury v. California*, 511 U.S. 318, 323, 114 S. Ct. 1526, 1529 (1994) (holding that officer's subjective and undisclosed view concerning whether person being interrogated is suspect is irrelevant to assessment whether person is in custody for *Miranda* purposes); *see also Shiflet v. State*, 732 S.W.2d 622, 628 (Tex. Crim. App. 1985) (holding oral statement admissible despite defendant, who was a suspect, making admission against interest). Rodriguez-Olivas's reliance on these cases is misplaced. In short, Rodriguez-Olivas confuses the analysis of an investigative detention with the analysis pertaining to whether statements against interest are admissible at trial. Notwithstanding the cases cited by Rodriguez-Olivas, the officers in this case were justified in detaining Rodriguez-Olivas beyond the scope of the traffic infractions for which he was initially stopped. *See Hill*, 303 S.W.3d at 873 ("[W]e hold that under the totality of circumstances the officers in this case had reasonable suspicion to continue to detain Hill to

35

investigate whether Hill was engaged in, or would soon engage in, criminal activity.").

We hold that the trial court did not err by implicitly finding that, under the totality of the circumstances, the officers in this case had reasonable suspicion to detain Rodriguez-Olivas to investigate his involvement in the events that Kaufman had reported. *See Hill*, 303 S.W.3d at 873; *Stevens*, 235 S.W.3d at 740. We overrule this portion of Rodriquez-Olivas's first, second, and third points.

## C.     Duration of the Detention

Even though Rodriguez-Olivas does not address the voluntariness of his consent to search his vehicle, he does address the duration of the investigatory detention as part of his first, second, and third points. Specifically, Rodriguez-Olivas argues that the detention between the time he was stopped and the time he consented to search his residence, which lasted sixty-nine minutes, "lasted considerably longer than necessary to confirm or dispel the officers' suspicions about" his involvement in Barrett's murder. *Cf. Josey v. State*, 981 S.W.2d 831, 845 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd) (permitting ninety-minute detention because officers did not continue to hold appellant after all legitimate components of the investigative detention had been completed). We disagree.

The reasonableness of the duration of a detention depends on whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the

36

defendant. *United States v. Sharpe*, 470 U.S. 675, 685, 105 S. Ct. 1568, 1575 (1985). Reasonableness is measured by balancing the nature of the intrusion into an individual's Fourth Amendment interests against the public interest of legitimate government interest at stake. *Zayas v. State*, 972 S.W.2d 779, 789 (Tex. App.—Corpus Christi 1998, pet. ref'd).

Reasonableness is to be judged from the perspective of a reasonable officer at the scene, rather than with the advantage of hindsight. *Rhodes v. State*, 945 S.W.2d 115, 118 (Tex. Crim. App.), *cert. denied*, 522 U.S. 894 (1997). Allowances must be made for the fact that officers must often make quick decisions under tense, uncertain, and rapidly changing circumstances. *Id.* Additional factors to consider in determining the reasonableness of the detention include the nature of the crime under investigation, the degree of suspicion, the location of the stop, the time of day, the number of suspects present, and the reaction of each suspect. *See Akins v. State*, 202 S.W.3d 879, 885 (Tex. App.—Fort Worth 2006, pet. ref'd) (*citing Illinois v. Wardlow*, 528 U.S. 119, 124–25, 120 S. Ct. 673, 676 (2000)).

Here, it should first be noted that Rodriguez-Olivas consented to the search of his vehicle within three minutes of the traffic stop. This alone supports the trial court's implicit ruling that the officers in this case acted reasonably. *See Vasquez v. State*, 324 S.W.3d 912, 925 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (Frost, J., concurring) ("Viewing the totality of the circumstances, the continued detention of appellant during the two-minute period between the

completion of the computer check and appellant's consent to a search of the vehicle was 'reasonable' as a matter of substantive Fourth Amendment law.").

Furthermore, the factors present in this case demonstrate that the officers acted reasonably. The officers were investigating a possible homicide. They had received information from an informant who made himself available to the police by going to the police station and giving a statement. Based on prior police interaction, the officers suspected that Rodriguez-Olivas was the "Juan" who lived on "Truelove Street"; who dated a woman named "Linda"; and who lived in a trailer home as Kaufman had described. They stopped Rodriguez-Olivas after he had twice driven by Jones, who had set up surveillance outside of the trailer home. Rodriguez-Olivas's passenger, Kuykendall, further piqued the officers' suspicions given her first name and her odd responses to questioning. Jones even pursued electronic means in trying to ascertain whether Kuykendall was the "Linda" that Kaufman had reported. *See Martinez v. State*, 304 S.W.3d 642, 655 (Tex. App.—Amarillo 2010, pet. ref'd) (holding that officers diligently pursued a means of investigation that was likely to dispel or confirm their suspicions as quickly as possible by detaining driver until burglary victim could be brought to scene to identify property found in vehicle). And as Kaufman had detailed to the police, Rodriguez-Olivas was found with a BB gun that appeared to be an actual pistol.

We conclude that the trial court did not abuse its discretion by implicitly concluding that the officers did not unconstitutionally prolong their detention of

Rodriguez-Olivas. *See Magana v. State*, 177 S.W.3d 670, 673 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (holding that driver's consent to search his vehicle and home was not fruit of unlawful, prolonged detention where driver consented within fifteen minutes of traffic stop). We overrule this portion of Rodriguez-Olivas's first, second, and third points.

### D.    Voluntary Consent

In the remainder of his first, second, and third points, Rodriguez-Olivas argues that the consent he gave to search his residence was involuntary. Thus, Rodriguez-Olivas argues that the trial court erred by not suppressing all of the evidence discovered past the point of his detention, including statements he made to Wilson in his jail cell.

#### 1.    Consent Law

One of the exceptions to the Fourth Amendment warrant requirement is a search conducted pursuant to a person's voluntary consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S. Ct. 2041, 2044–45 (1973); *Meekins*, 340 S.W.3d at 458. The validity of a consent to search is a question of fact to be determined from all the circumstances. *Maxwell v. State*, 73 S.W.3d 278, 281 (Tex. Crim. App.), *cert. denied*, 537 U.S. 1051 (2002). A person's consent to search can be communicated to law enforcement in a variety of ways, including by words, actions, or circumstantial evidence showing implied consent. *Johnson v. State*, 226 S.W.3d 439, 440–41 (Tex. Crim. App. 2007) (reasoning that calling 911 and asking for police assistance constituted implied consent for police to

enter defendant's home and investigate a homicide); *Gallups v. State*, 151 S.W.3d 196, 201 (Tex. Crim. App. 2004) (holding that hand gesture made toward officer to be sufficient consent for the officer to enter defendant's home). "But the Fourth . . . Amendment[] require[s] that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth*, 412 U.S. at 228, 93 S. Ct. at 2048; *Maxwell*, 73 S.W.3d at 281. The trial judge must conduct a careful sifting and balancing of the unique facts and circumstances of each case in deciding whether a particular consent to search was voluntary or coerced. *Schneckloth*, 412 U.S. at 233, 93 S. Ct. at 2050.

Courts review the totality of the circumstances of a particular police-citizen interaction from the point of view of an objectively reasonable person, without regard for the subjective thoughts or intents of either the officer or the citizen. *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S. Ct. 2778, 2783 (1985) ("Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time,' and not on the officer's actual state of mind at the time the challenged action was taken.") (quoting *Scott v. United States*, 436 U.S. 128, 136, 98 S. Ct. 1717, 1723 (1978)). The ultimate question is whether the person's "will ha[s] been overborne and his capacity for self-determination critically impaired," such that his consent to search must have been involuntary. *United States v. Watson*, 423 U.S. 411, 424, 96 S. Ct. 820, 828 (1976) (quoting *Schneckloth*, 412 U.S. at 225, 93 S. Ct. at 2047).

Under federal law, the government must show voluntary consent by a preponderance of the evidence, but Texas has long stated that the State must "prove the voluntariness of a consent to search by clear and convincing evidence." *Compare United States v. Arias-Robles*, 477 F.3d 245, 248 (5th Cir.), *cert. denied*, 550 U.S. 978 (2007); *State v. Ibarra*, 953 S.W.2d 242, 245 (Tex. Crim. App. 1997). The legal analysis, however, is the same in both Texas and federal courts: whether consent was voluntary is a fact question and must be analyzed based on the totality of the circumstances. *Meekins*, 340 S.W.3d at 460.

Trial courts may consider numerous factors in the voluntariness analysis. *See Reasor v. State*, 12 S.W.3d 813, 818 (Tex. Crim. App. 2000) (noting factors that the Supreme Court has taken into consideration in determining whether consent is voluntary). Because issues of consent are necessarily fact intensive, a trial court's finding of voluntariness must be accepted on appeal unless it is clearly erroneous. *See Juarez v. State*, 758 S.W.2d 772, 779 (Tex. Crim. App. 1988) ("Voluntariness is a question of fact to be determined from the totality of the circumstances, and we accept the trial court's finding unless it is clearly erroneous") (internal citation omitted), *overruled on other grounds by Boyle v. State*, 820 S.W.2d 122, 125 (Tex. Crim. App. 1989), *cert. denied*, 503 U.S. 921 (1992).

41

### 2. Consent to Search Rodriguez-Olivas's Trailer Home

Here, viewing the evidence in the light most favorable to the trial court's ruling and considering the totality of circumstances, we cannot conclude that the trial court's implied conclusion that Rodriguez-Olivas voluntarily consented to the search of his residence was clearly erroneous. *Meekins*, 340 S.W.3d at 459. Indeed, during the course of a conversation between Jones and Rodriguez-Olivas, and as Rodriguez-Olivas smoked a cigarette with Kuykendall on the curb, Jones asked Rodriguez-Olivas for consent to search his trailer home. The record demonstrates that Jones relayed to another officer that he believed that he could obtain consent from Rodriguez-Olivas based on his relationship with him. Jones and Rodriguez-Olivas's relationship can be observed in the video from Jones's in-car camera. Rodriguez-Olivas and Jones were cordial toward one another. Rodriguez-Olivas even asked Jones, "How have you been, Mr. Jones?" At one point, Jones even wiped the sweat from Rodriguez-Olivas's brow, to which Rodriguez-Olivas can be heard thanking Jones.

Further, Jones had already obtained consent to search Rodriguez-Olivas's vehicle, and twice after searching the vehicle, Rodriguez-Olivas's consented to Jones's re-entry of the vehicle—once under Rodriguez-Olivas's instructions that the receipt to his prescription was in the vehicle and another time to retrieve cigarettes and a lighter so that Rodriguez-Olivas and Kuykendall could smoke. Kuykendall can even be heard in the video telling someone on her phone that Jones was "nice" and "just doing [his] job." And Rodriguez-Olivas can clearly be

42

heard stating to Jones upon Jones's request to search his residence, "Sure, I guess," after which, Rodriguez-Olivas and Jones locked Rodriguez-Olivas's vehicle, and Rodriguez-Olivas can be seen getting into Jones's patrol vehicle on the opposite side of the vehicle, after Jones had entered the patrol vehicle. All of these acts seen and heard on the video are consistent with Jones's testimony that Rodriguez-Olivas voluntarily consented to the search of his trailer home.

Rodriguez-Olivas argues that his consent was not voluntary because it was "nothing more than submission to a show of authority." Rodriguez-Olivas cites to the fact that there were three officers at his vehicle within seconds of Frith having stopped him. He also cites to the fact that officers drew their service weapons when they first approached his vehicle, and that they patted him down upon requesting that he exit his vehicle. We conclude that under the circumstances, the officers were justified in taking these actions.

As the United States Supreme Court stated in *Terry v. Ohio*, 392 U.S. 1, 24, 88 S. Ct. 1868, 1881 (1968),

> In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves and other prospective victims of violence in situations where they may lack probable cause for an arrest. When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm. *See also Lewis v. State*, 502 S.W.2d 699, 702–03 (Tex. Crim. App. 1973).

43

The record in the instant case evidences that the actions taken by the officers, who in the course of the traffic stop had to make quick decisions on the scene as how to protect themselves, acted reasonably. Indeed, the officers were acting upon the report that the person they suspected was driving the vehicle, Rodriguez-Olivas, was armed and possibly had murdered someone. *See Wood v. State*, 515 S.W.2d 300, 306 (Tex. Crim. App. 1974) ("The facts detailed reflect that a reasonably prudent man would have been warranted in believing the appellant was armed and presented a threat to the officer's safety while investigating the suspicious behavior described."). The officers in this case quickly re-holstered their weapons once they concluded that Rodriguez-Olivas did not present an immediate threat. Furthermore, Rodriguez-Olivas's consent to search his residence occurred more than an hour after officers had withdrawn their weapons. We conclude that under the circumstances, the officers' initial show of force was not unreasonable and that the trial court properly concluded that Rodriguez-Olivas's consent was not affected by the early and brief display of weapons.

We hold that the trial court's conclusion that Rodriguez-Olivas had consented to the search of his residence was not clearly erroneous. *Meekins*, 340 S.W.3d at 458 (holding that trial court did not clearly err by finding that driver's statement "I guess" was voluntary consent to search vehicle).

### 3. Consent to Search the Closet

Rodriguez-Olivas also argues that Jones exceeded the consent granted to search his trailer home when Jones searched the closet. Rodriguez-Olivas argues that assuming his consent to search his residence was voluntary, Jones exceeded the scope of his consent because Jones had asked him if they could search the trailer home for Barrett, and that searching the closet exceeded the requested consent.

The State counters that Rodriguez-Olivas gave additional consent through his action of unlocking the closet to allow Jones to see inside. We agree with the State.

The extent of a search is limited by the scope of the consent given by an individual. *Simpson v. State*, 29 S.W.3d 324, 330 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). The scope of consent is determined objectively; in other words, we determine what the typical, reasonable person would have understood by the exchange between the suspect and the officer. *Florida v. Jimeno*, 500 U.S. 248, 252, 111 S. Ct. 1801, 1804 (1991); *Simpson*, 29 S.W.3d at 330. Additionally, a suspect is free to withdraw or limit his consent at any time. *Jimeno*, 500 U.S. at 252, 111 S. Ct. at 1804; *Simpson*, 29 S.W.3d at 330.

Assuming without deciding that Rodriguez-Olivas limited his initial consent to search his trailer home to visible areas of the trailer and not the closet (although clearly Barrett could have been and was in the closet), we conclude that the record evidence supports the trial court's implied finding that Rodriguez-

45

Olivas consented to the search of his closet. Indeed, when Jones asked what was in the closet and after Rodriguez-Olivas stated "that's just a closet," Jones asked to be allowed to look inside. Rodriguez-Olivas responded, "Yes." Jones and Frith testified at the suppression hearing that Rodriguez-Olivas then proceeded to unlock the closet and allow Jones to look inside. Rodriguez-Olivas never objected to Jones's looking into the closet. Rodriguez-Olivas's silence upon Jones looking into the closet after Rodriguez-Olivas had unlocked it affirmed the consent to search therein. *See Jimeno*, 500 U.S. at 252, 111 S. Ct. at 1804; *Simpson*, 29 S.W.3d at 330. We overrule the remainder of Rodriguez-Olivas's first, second, and third points.

## E. Sudden Passion Defense

In his fourth point, Rodriguez-Olivas argues that the evidence in this case demonstrated that he acted under the immediate influence of sudden passion when he killed Barrett and that the jury's verdict finding otherwise is reversible error. The State argues that Rodriguez-Olivas has shifted the burden of his sudden-passion defense and that the jury was free to disbelieve Rodriguez-Olivas's testimony that he acted under the immediate influence of sudden passion when he killed Barrett. We agree with the State.

At the punishment phase of a trial, a "defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the

46

second degree." Tex. Penal Code Ann. § 19.02(c), (d); *see McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005). "Sudden passion," under the circumstances of this case, means passion provoked by the decedent that "arises at the time of the offense and is not solely the result of former provocation." Tex. Penal Code Ann. § 19.02(a)(2). An "[a]dequate cause" is "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1).

The issue of sudden passion is akin to an affirmative defense because the defendant has the burden of proof by a preponderance of the evidence. *See Matlock v. State*, 392 S.W.3d 662, 667 & n.14 (Tex. Crim. App. 2013); *Bradshaw v. State*, 244 S.W.3d 490, 502 (Tex. App.—Texarkana 2007, pet. ref'd). We review a sufficiency challenge to a jury's rejection of an affirmative defense to determine whether the jury's adverse finding was so against the great weight and preponderance of the evidence as to be manifestly unjust. *Matlock*, 392 S.W.3d at 671. We consider the evidence in a neutral light, but we "may not usurp the function of the jury by substituting [our] judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony." *Id.*

Here, the jury was free to disbelieve Rodriguez-Olivas's testimony that because Barrett had taunted him and allegedly said that she had aborted her pregnancy, he acted under a sudden passion formed at the time he stabbed her. The record evidence indicates that Rodriguez-Olivas and Barrett argued

47

frequently, that Barrett previously had been seen in torn clothing with scratches on her neck, and that Rodriguez-Olivas was frequently jealous regarding Barrett and the possibility of her cheating on him. The jury also heard ample evidence that Rodriguez-Olivas used methamphetamine and that he had previously confronted Simpson in an accusatory manner about his relationship with Barrett.

The record evidence further indicates that Rodriguez-Olivas attempted to conceal Barrett's body in the closet; that he had planned to discard bloody clothing in a river; and that he had told Wilson that he had murdered Barrett because she would not "shut up," she had previously broken a flat-screen television, and she had caused the police to be called to the trailer home. The record also indicates that police had in fact been to the trailer home previously because of disputes between Rodriguez-Olivas and Barrett.

From the evidence in the record, we hold that the jury's decision to reject Rodriguez-Olivas's defense—that he caused Barrett's death while under a sudden passion and with adequate cause—is not so against the great weight and preponderance of the evidence as to be manifestly unjust. *See Matlock*, 392 S.W.3d at 671. We overrule Rodriguez-Olivas's fourth point.

### F.    Prosecutor's Comment

In his fifth point, Rodriguez-Olivas argues that the prosecutor committed harmful error during closing arguments at the punishment phase. The State counters that, assuming error, the trial court cured any potential error by instructing the jury to follow the law as outlined in the jury charge.

After having read the definitions of "sudden passion" and "adequate cause" to the jury as they were contained in the court's charge, the following colloquy took place,

[Prosecutor]: [L]et's assume for a minute, that we believed the latest version of [Rodriguez-Olivas's] stories. The story, the tearful story that he told us here on the witness stand. Then we would have to examine whether he can meet the definition in the Court's charge, that of ordinary temper. But we know that he is a drug addict. He always acted schitzy. And we know from the rest of the testimony that he is not a –

[Defense Counsel]: Excuse me.

[Prosecutor]: -- person of ordinary temper.

[Defense Counsel]: Judge, we object to as to whether or not Mr. Rodriguez[-Olivas] can meet the burden of ordinary temper. I don't think he has the burden to meet. I believe that if the Court's charge outlining the law, that rage or anger must be such that a person of ordinary temperament would be enraged, not necessary that to the exclusion of anybody else, if they don't have ordinary temper. And my objection is that the State is attempting to set a standard that the law does not require. That's my objection, Your Honor.

THE COURT: Okay. I'm overruling the objection. And again, I just remind the jury that this is the argument of the lawyers. The law that is applicable to this case is contained -- contained in the jury charge, which will, again, be placed in the jury room for your review.

This is where the attorneys are able to argue to you what they believe the law is, and what they believe the facts are. But you are to be governed by the law and it is stated in the charge.

49

Assuming *arguendo* that the prosecutor misstated the law, we cannot conclude that the statement was harmful. We have held that prosecutorial misstatements of law are not constitutional in nature. *Coggeshall v. State*, 961 S.W.2d 639, 643 (Tex. App.—Fort Worth 1998, pet. ref'd); *see also* Tex. R. App. P. 44.2(a), (b). In conducting a harm analysis under Rule 44.2(b), we disregard nonconstitutional errors unless appellant's substantial rights are affected. A substantial right is affected when error has a substantial and injurious effect or influence on the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). To determine whether a prosecutor's misstatement of law had a substantial and injurious effect or influence on the jury's verdict, we look at all the evidence and the court's charge, as well as the alleged misstatement. *Herrera v. State*, 11 S.W.3d 412, 415 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd). Absent evidence to the contrary, a jury is presumed to follow the instructions set forth in the court's charge. *Hutch v. State*, 922 S.W.2d 166, 172 (Tex. Crim. App. 1996); *see also Walker v. State*, 300 S.W.3d 836, 850 (Tex. App.—Fort Worth 2009, pet ref'd) ("Courts will abandon this presumption only if there is evidence showing that the jury did not follow the instructions."). Such presumption, however, can be rebutted. *See Resendiz v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003).

Here, the jury charge correctly stated the definition for sudden passion, and Rodriguez-Olivas does not argue otherwise. Furthermore, even after overruling defense counsel's objection, the trial court instructed the jury to follow

the law as defined in the court's charge. *See Young v. State*, 283 S.W.3d 854, 882 (Tex. Crim. App. 2009) (Cochran, J., concurring) ("We must, however, 'presume [] that jurors, conscious of the gravity of their tasks, attend closely [to] the particular language of the trial court's instructions in criminal cases and strive to understand, make sense of, and follow the instructions given them.'") (citing *Francis v. Franklin*, 471 U.S. 307, 324 n.9, 105 S. Ct. 1965, 1976 n.9 (1985)); *Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996). We fail to find anything in the record suggesting that the prosecutor's alleged misstatement had a substantial and injurious effect or influence on the jury's verdict. *See* Tex. R. App. P. 44.2(b). We overrule Rodriguez-Olivas's fifth point.

## IV. CONCLUSION

Having overruled Rodriguez-Olivas's five points on appeal, we affirm the trial court's judgment.

/s/ Bill Meier
BILL MEIER
JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER AND MEIER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: October 15, 2015

51

Print this page

# Envelope 7832976

## Case Information

| | |
|---|---|
| Location | Court Of Criminal Appeals |
| Date Filed | 11/15/2015 04:12:44 PM |
| Case Number | |
| Case Description | |
| Assigned to Judge | |
| Attorney | John Nation |
| Firm Name | John D. Nation |
| Filed By | John Nation |
| Filer Type | Not Applicable |

## Fees

| | |
|---|---|
| Convenience Fee | $0.09 |
| Total Court Case Fees | $0.00 |
| Total Court Filing Fees | $0.00 |
| Total Court Service Fees | $0.00 |
| Total Filing & Service Fees | $0.00 |
| Total Service Tax Fees | $0.00 |
| Total Provider Service Fees | $2.99 |
| Total Provider Tax Fees | $0.25 |
| Grand Total | $3.33 |

## Payment

| | |
|---|---|
| Account Name | JOHN NATION VISA |
| Transaction Amount | $3.33 |
| Transaction Response | |
| Transaction ID | 12777611 |
| Order # | 007832976-0 |

## Petition for Discretionary Review

| | |
|---|---|
| Filing Type | EFile |
| Filing Code | Petition for Discretionary Review |
| Filing Description | Petition for Discretionary Review |
| Reference Number | 851761 |
| Comments | |
| Status | Rejected |

## Fees

| | |
|---|---|
| Court Fee | $0.00 |
| Service Fee | $0.00 |

## Rejection Information

| Rejection Reason | Time | Rejection Comment |
|---|---|---|
| Other | 11/17/2015 11:05:47 | The petition for discretionary review does not contain the identity of Judge, Parties and Counsel [Rule 68.4(a)]. You have ten days to tender a corrected petition for |

AM        discretionary review.

## Documents

*Lead Document*        Rodriguez-Olivas PDR.pdf        [Original]